**15 MAG     4558**

ORIGINAL

Approved: _____

ANDREW MARK THOMAS/JAIMIE LEESER NAWADAY
Assistant United States Attorneys

Before:    HONORABLE FRANK MAAS
           United States Magistrate Judge
           Southern District of New York

U.S. DISTRICT COURT
FILED
DEC 18 2015
S.D. OF N.Y.

DOC #_____

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :   **SEALED COMPLAINT**

       - v. -                      :   Violation of
                                       18 U.S.C. § 1349
SAMANTHA BOUBERT,                  :
CHRISTINE MAHARAJ, and                 COUNTY OF OFFENSE:
OWEN REID,                         :   NEW YORK

          Defendants.             :

- - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        ROBERT GOLDBACH, being duly sworn, deposes and says
that he is a Special Agent with the Federal Bureau of
Investigation ("FBI"), and charges as follows:

### COUNT ONE

    (Conspiracy to Commit Wire Fraud and Bank Fraud)

        1.    From at least in or about January 2013 up to and
including at least in or about May 2015, in the Southern
District of New York and elsewhere, SAMANTHA BOUBERT, CHRISTINE
MAHARAJ, and OWEN REID, the defendants, and others known and
unknown, willfully and knowingly, did combine, conspire,
confederate, and agree together and with each other to commit
wire fraud, in violation of Title 18, United States Code,
Section 1343, and bank fraud, in violation of Title 18, United
States Code, Section 1344.

        2.    It was a part and object of the conspiracy that,
SAMANTHA BOUBERT, CHRISTINE MAHARAJ, and OWEN REID, the
defendants, and others known and unknown, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud and for obtaining money and property by

means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

3.    It was a further part and object of the conspiracy that SAMANTHA BOUBERT, CHRISTINE MAHARAJ, and OWEN REID, the defendants, and others known and unknown, willfully and knowingly, would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge and the foregoing charge are, in part, as follows:

4.    I have been a Special Agent with the FBI for approximately three years. I have also been personally involved in the investigation of this matter, and have been involved in the investigation and prosecution of numerous fraudulent schemes. This affidavit is based upon my own observations, conversations with other law enforcement agents and others, and my examination of reports and records prepared by others. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Background

5.    At all times relevant to this Complaint, Homeowner Assistance Services of New York ("HASNY") was purportedly an organization that provided assistance to homeowners who were seeking to avoid foreclosure. HASNY maintains an office at 189-10 Hillside Avenue, Hollis, New York

(the "Hillside Address"), and lists its address in corporate filings as 69 Horatio Street, Apartment 2F, New York, New York (the "Horatio Address"). Until at least April 2015, HASNY maintained a website at www.hasony.com as well as a Facebook page. Until at least May 2015, the premises of the Hillside Address had an exterior sign reading, "Homeowners Assistance Services of New York."

6.    At all times relevant to this Complaint, Launch Development, LLC ("Launch Development") was purportedly a for-profit real estate company. Launch Development also maintains an office at the Hillside Address, and lists its address in corporate filings as the Horatio Address. Launch Development is owned by two co-conspirators not named herein ("CC-1" and "CC-2").

7.    In addition to HASNY and Launch Development, multiple other businesses maintained formal or informal offices at the Hillside Address (collectively, the "Hillside Businesses," and individually a "Hillside Business"), including HAR Property Management, Springfield Realty, Amiron Development Corp., Martin Development and Management LLC, and Horatio Management LLC.

8.    Based on a review of corporate filings, bank account records, and documents obtained from the Hillside Address, and based upon my training and experience investigating fraud, I have learned that the Hillside Businesses were merely different fronts for the same enterprise.

## An Overview of the Hillside Fraud

9.    Beginning in or about at least January 2013, through in or about at least May 2015, SAMANTHA BOUBERT, CHRISTINE MAHARAJ, and OWEN REID, the defendants, and others, including CC-1 and CC-2, (collectively, the "Hillside Fraud Team") targeted distressed homeowners living in the New York City area, including the Bronx, Brooklyn, and Queens. The Hillside Fraud Team primarily operated out of the Hillside Address. The Hillside Fraud Team aimed to trick or coerce homeowners into selling or deeding their properties to a Hillside Business (the "Hillside Fraud").

10.    At the direction of CC-2 and others, the Hillside Fraud Team sent mailings under the HASNY letterhead to the owners of distressed properties, inviting them to seek assistance from HASNY to avoid foreclosure and save their homes.

Additionally, the Hillside Fraud Team hired telemarketers to contact homeowners and to invite them to meet with HASNY representatives to learn more about avoiding foreclosure.

11. OWEN REID, the defendant, and others, including CC-1 and CC-2, trained and directed telemarketers to appeal to the emotions of the owners of distressed properties. REID, along with others, also developed a script for telemarketers to use in their calls. This script included, in substance and in part, a statement that a short sale would be a means for homeowners to lower their monthly payments and still remain in their homes.

12. Many of the homeowners who sought assistance from HASNY met with a member of the Hillside Fraud team ("CC-3"), who typically advised each homeowner that HASNY could assist him or her with a loan modification. In still other cases, CC-3 advised the homeowner that a loan modification could not be completed, but that the homeowner could engage in a type of short sale in which the homeowner would sell the property to a third party, Launch Development, and then within approximately 90 days arrange for a relative of the homeowner to repurchase the property from Launch Development. CC-3 typically explained that the homeowner could remain in his or her home throughout the entire process. CC-3 often was assisted by other members of the Hillside Fraud Team, including, on separate occasions, by OWEN REID and CHRISTINE MAHARAJ, the defendants.

13. After an initial meeting with homeowners, CC-3 then typically scheduled a closing at which the homeowner would meet with another co-conspirator ("CC-4"), who was described as the homeowner's attorney for the transaction. The homeowners, who had been led to believe that they were about to receive a loan modification or would be able to transfer their property to a trusted relative, were then encouraged to sign documents presented by CC-4, which in some cases were blank. Unbeknownst to the homeowners, by signing some of those documents, they were agreeing to sell their homes to a Hillside Business—often Launch Development—and would be forced to vacate their homes soon thereafter.

14. As part of the fraud, the Hillside Fraud Team often used Uniform Commercial Code ("UCC") liens to coerce victims into dealing with Hillside Businesses. SAMANTHA BOUBERT, the defendant, had responsibility within the Hillside Fraud Team for filing liens on homeowner properties. BOUBERT filed liens on homeowners' properties even when those homeowners owed no debt to a Hillside Business.

4

15.   After purchasing a property from a homeowner, CC-1 and CC-2 typically appeared at the homeowner's residence and demanded that the homeowner vacate the premises, or commenced eviction proceedings against the homeowner, or both.

16.   In response to the national mortgage crisis, the United States Department of the Treasury announced that it would partner with financial institutions to reduce struggling homeowners' monthly mortgage payments through the Home Affordable Modification Program ("HAMP"), which was a part of the federal Troubled Asset Relief Program ("TARP"). To complete short sales, the Hillside Fraud Team would submit documents to mortgage issuer banks, which included banks that had received TARP monies.

### The Hillside Fraud in Practice

17.   From my review of the HASNY website and HASNY Facebook page as they appeared in or about Spring 2015, I have learned, in part, that the Hillside Fraud Team held HASNY out as a business that provided assistance to homeowners facing foreclosure. For example:

a.   HASNY advertised on its website, in sum and substance, that it provided assistance to homeowners who were seeking to avoid foreclosure.

b.   HASNY specifically listed "foreclosure avoidance" as its primary service and represented that HASNY is "authorized to negotiate with the bank" and "expedite[s] the paperwork with a speedy process to accommodate you and save your home." Elsewhere, the website states that "[h]omeowners unable to make their mortgage payments can look for alternatives to avoid foreclosure. . . . Let us work on your situation and preserve your dream of homeownership."

c.   HASNY's Facebook page advertised that HASNY was "New York City's #1 resource for homeowners," represents that it offers "free service to Brooklyn residents" and contains graphics stating, "stop foreclosures" and "avoid foreclosure." HASNY's Facebook page identified HASNY's address as the Hillside Address.

18.   I interviewed four former employees of Hillside Businesses ("Employee-1," "Employee-2," "Employee-3," and "Employee-4," collectively, the "Former Employees"). Each of the Former Employees worked at the Hillside Address for all or part

of the period between January 2013 and May 2015. Each of the Former Employees eventually quit.[1]

19.   From my interviews with the Former Employees, I have learned, in part, that, notwithstanding representations made in HASNY's name about foreclosure avoidance, the Hillside Fraud Team intended to acquire the homes of distressed homeowners. For example:

a.   Employee-1 learned that the Hillside Fraud Team tried to execute a "buy back" scam. Hillside Business representatives initially told homeowners that they would assist them with a loan modification, but then later told them that loan modification was impossible due to their bad credit. Hillside Business representatives then told the homeowner that the company would buy their homes and sell those homes back to the homeowners' family members.

b.   Employee-3 understood HASNY's business goal was to provide short sales. Employee-3 stated, in substance and in part, that HASNY offered to help distressed homeowners, but that the offer to help was a lie intended to secure a short sale and that HASNY personnel did not intend to help distressed homeowners.

c.   Employee-4 once overheard CC-3 praise an employee for obtaining bank approval on a loan modification. CC-1 then cursed and yelled at CC-3, stating, in sum and substance, that HASNY did not make money through loan modifications.

d.   During her employment, Employee-1 learned that victims would sign blank paperwork without any representatives of a Hillside Business listed on the paperwork. Later, a member of the Hillside Fraud Team would fill in the paperwork and give a copy to the victim.

e.   Employee-4 learned that CC-1 and CC-2 used one of the Hillside Businesses, Springfield Realty, to sell houses obtained from victims.

20.   Based upon my conversations with an individual ("Victim-1") and my review of documents provided by Victim-1, I learned, among other things, the following:

---

[1] The Former Employees, who have assisted the investigation into the Hillside Fraud, have not been charged with any crimes, but may face criminal liability for their work at the Hillside Address.

a.    In or about December 2013, Victim-1 had fallen behind on mortgage payments associated with her residence, which was located in Brooklyn, New York. Victim-1 was facing foreclosure and contacted HASNY for assistance. Victim-1 spoke with someone purporting to be an employee of HASNY over the phone and arranged to visit the office.

b.    In or about January 2014, Victim-1 visited the HASNY office at the Hillside Address and met with CC-3. Victim-1 explained to CC-3 that she wanted to receive a loan modification. CC-3 asked for certain items of information from Victim-1 to begin the process of applying for a loan modification and scheduled an additional meeting.

c.    In or about February 2014, Victim-1 again met with CC-3 at the Hillside Address. At the meeting CC-3 provided Victim-1 with a "Short Sale/Modification Check List" but highlighted the "Modification Check List." On a separate page, CC-3 wrote the lowered monthly mortgage payments that Victim-1 could expect to make as a result of the loan modification, estimating that Victim-1 could soon pay only $1,772 per month on her mortgage.

d.    In or about March 2014, CC-2 visited Victim-1's home with an appraiser. CC-2 explained that they were there to appraise the home and that Victim-1 should point out any damages or issues with the house that could help to lower the value, purportedly in order to lower Victim-1's loan payments.

e.    On or about March 27, 2014, CC-3 called Victim-1 to schedule another meeting to complete what Victim-1 believed would be the loan modification transaction. CC-3 informed Victim-1 that an attorney would be provided for her.

f.    When Victim-1 arrived at the Hillside Address a few days later, CC-3 introduced her to CC-4, and informed Victim-1 that CC-4 would be her attorney. Victim-1 was presented with numerous documents to sign, many of which were blank. When Victim-1 asked CC-4 why the documents were blank, he responded, in sum and substance, that she would receive completed copies later and that the process was normal and typical for loan modifications. Victim-1 proceeded to sign the documents. At the time she signed these documents, Victim-1 believed, based in part on representations made to her by CC-2, CC-3, and CC-4, that she was obtaining a loan modification that would lower her monthly payments to approximately $1,772 per month. In reality, the documents provided for a short sale of

Victim-1's home to Launch Development for approximately
$335,000.

g.   Victim-1 had purchased her home in or about
October 2006 for more than $700,000.

h.   In or about June 2014, CC-1 and CC-2 came to
Victim-1's home, informed Victim-1 that they now owned her home,
and demanded that she move out. Around the same time, notices
were placed on Victim-1's property, which was a multi-family
property that included rental units, stating that "effective
immediately all rental payments are to be made to Launch
Development LLP as the new and lawful owner of this property."
The notices included a business card for CC-3, listing him as
the "Business Development Manager" for Launch Development.

i.   On one occasion, CC-1, CC-2, CC-3, and CC-
2's girlfriend came to Victim-1's home to intimidate her to move
out. Victim-1 told the group that she had not agreed to do so.
CC-1 then yelled, in substance, "It's not what he says," meaning
CC-3, "it's what I say. I'm the boss. It's what I say."

j.   In or about August 2014, after Launch
Development began eviction proceedings against Victim-1, Victim-
1 moved out of her home.

21.   Based on interviews conducted with more than one
dozen victims, and conversations with law enforcement officers
who have interviewed still more victims, I have learned of more
than two dozen victims whose experiences with the Hillside Fraud
Team closely resemble the scheme described by the Former
Employees and experienced by Victim-1.

## OWEN REID

22.   Based on interviews with the Former Employees, I
have learned, among other things, that OWEN REID, the defendant,
acted as a telemarketing manager for HASNY and, with others,
trained telemarketers on what to say to homeowners.

23.   Based on a review of paper and electronic files
maintained at the Hillside Address, I have learned, in part, the
following:

a.   OWEN REID, the defendant, was issued a HASNY
business card and used a HASNY email address.

b.   REID's name was used on HASNY flyers that, among other things, stated "Many homeowners have no idea where to turn for qualified assistance. Distressed-mortgage homeowners are finding hope and help for the services they need to prevent foreclosure from occurring here at Homeowners Assistance Services of New York."

c.   A type-written telemarketing script kept at the Hillside Address (the "Script") indicated that the response to the question, "What is H.A.S.?" was "Homeowner Assistance Services of New York. What we do here is we help home owners who are in distress with their mortgages so that they don't go into foreclosure." Hand-written notes next to, and over, the type-written response included the statement, "We can help you bring down your interest rate."

d.   A one-page document entitled "Closing 101" recited four tasks for telemarketers: (1) "Eliminate all other options"; (2) "Break down a short sale in detail without saying the words short sale"; (3) "Talk about the company"; and (4) "Find out when your prospect is free during the week. Then book the appointment time." The document also instructed, in part, that "The goal is to have all qualified prospects sign a short sale contract"; ""Short sale is a scary word that most prospects don't fully understand"; and "Don't be afraid to embellish for instance telling prospects we are a Half billion dollar hedge fund."

e.   The Script and the "Closing 101" document were both part of a collection of documents entitled, "Training Package[:] The Road to Success at H.A.S."

24.   Based on a review of records of bank accounts held by Launch Development and HASNY, I have learned, in part, that between in or about January 2013 and in or about February 2015, OWEN REID, the defendant, received approximately twenty-four payments from a bank account in Launch Development's name ("Launch Account 1"), for a cumulative total of approximately $42,703.00; approximately six additional payments from a separate bank account in Launch Development's name ("Launch Account 2"), for a cumulative total of approximately $9,400; and approximately twenty-one payments from an account in HASNY's name (the "HASNY Account"), for a cumulative total of approximately $45,950.00.

25.   From my interview with an individual ("Victim-2"), and my review of documents provided by Victim-2, I have

learned, among other things, the following:

        a.    By in or about 2013, Victim-2, a physically disabled man, had fallen behind on his mortgage payments associated with his residence, located in Bronx, New York.

        b.    On repeated occasions in 2013, Victim-2 received telephone calls from OWEN REID, the defendant, purporting to represent HASNY. At points during 2013, Victim-2 received phone calls from REID approximately every day for months at a time. REID invited Victim-2 to visit HASNY's offices to speak about servicing his mortgage, selling his house for him, or buying his house from him.

        c.    In or about December 2013, Victim-2 traveled to HASNY's offices with the deed to his property as instructed by REID. Once inside the offices, Victim-2 met with REID and CC-2. REID and CC-3 told Victim-2 to sign the deed to his property over to them temporarily so that they would be able to negotiate with the bank on his behalf and also to negotiate with the City of New York concerning building code violations. REID and CC-3 told Victim-2 that they would pay off his mortgage and then give him at least $10,000.00 for any relocation or moving expenses which he would incur, so that he received at least $10,000.00 over the sale price of the home.

        d.    During the meeting, REID and CC-3 pressured Victim-2 to sign two blank white papers with no writing on lines on the paper. The only mark on the paper was an "x" where Victim-2 was instructed to sign. CC-3 said the papers were a temporary deed transfer and a contract of service. CC-3 assured Victim-2 that HASNY was a full service real estate company and that they had attorneys review all documents. Later in the meeting—after Victim-2 had signed the paperwork presented to him by CC-3 and REID—CC-2 arrived and told Victim-2 that a short sale would be the best way to move forward with the transaction. Neither REID, nor CC-2, nor CC-3 explained the terms of a short sale to Victim-2.

        e.    Based on his meeting with REID, CC-2, and CC-3, Victim-2 understood that he had to move out of his home to complete the transaction. Victim-2 moved out of his home in or about early 2015.

        f.    CC-3 scheduled a short sale closing for on or about June 19, 2015. When Victim-2 called HASNY on or about June 19, 2015 to confirm the meeting, he was told that there

would be no closing that day. Victim-2 has subsequently called
HASNY representatives to inquire about the status of his
property. On one of more calls to HASNY, Victim-2 has spoken to
purported employees of HASNY who have told Victim-2 that there
is no scam going on, that the company continues to do real
estate closings, and that CC-3 is busy and cannot take Victim-
2's calls.

      26.   Based on a review of records of Launch Account 1,
I have learned, in part, that Launch Development paid Victim-2 a
total of approximately $2,500 by check.

## CHRISTINE MAHARAJ

      27.   On or about August 27, 2015, CHRISTINE MAHARAJ,
the defendant, consented to a voluntary interview with federal
law enforcement and, in part, stated that she had worked at the
Hillside Address for approximately two years, beginning after
approximately August 2012.

      28.   Based on interviews with the Former Employees, I
have learned, in part, that:

      a.   CHRISTINE MAHARAJ, the defendant, had
responsibility for home appraisals, the processing of short
sales, and acting as a notary public.

      b.   MAHARAJ prepared home value appraisals to
obtain the correct number for what HASNY wanted.

      c.   MAHARAJ forged victim signatures on
documents to be submitted to banks and also superimposed victim
signatures onto documents to be submitted to banks.

      d.   MAHARAJ supervised Employee-1, among others.
On multiple occasions, Employee-1 received telephone calls and
complaints from victims about losing their homes. Employee-1
would pass those complaints to MAHARAJ. MARAHAJ would instruct
Employee-1 to tell the victims that Employee-1 was working on
it. In actuality, neither MAHARAJ nor Employee-1 were doing
anything to help the victims.

      29.   Based on a review of records of bank accounts
held by Launch Development and HASNY, I have learned, in part,
that between in or about January 2013 and in or about February
2015, CHRISTINE MAHARAJ, the defendant, received approximately
two payments from Launch Account 1, for a cumulative total of
approximately $6,100; and approximately thirteen payments from

the HASNY Account, for a cumulative total of approximately
$18,900.00.

30.   From my interview with a married couple ("Victim-
3 and Victim-4") and my review of documents provided by Victim-3
and Victim-4, I have learned, among other things, the following:

a.   In late 2010, Victim-3 and Victim-4 began to
fall behind on their mortgage payments.

b.   In or about September 2013, Victim-3 and
Victim-4 were contacted by a telemarketer from HASNY in
September 2013, but continued their conversations with
"Christine,"[2] and CC-3.

c.   CHRISTINE MAHARAJ, the defendant, told
Victim-3 and Victim-4 that their poor credit made a loan
modification impossible, so that the best choice to save their
home would be a short sale.

d.   Victim-3 and Victim-4 told CC-3 that they
did not wish to sell their home. CC-3 explained to Victim-3 and
Victim-4 that they would never have to move out of their home
and that a short sale would be similar to a home modification.

e.   On September 29, 2014, Victim-3 and Victim-4
executed documents for a short sale. CC-4 and another attorney,
CC-5, were present at the transaction. CC-4 met Victim-3 and
Victim-4 approximately five minutes prior to the closing and CC-
4 did not discuss the details of the contract with Victim-3 and
Victim-4. CC-4 told Victim-3 and Victim-4 to address their
questions to CC-3.

f.   Victim-3 and Victim-4 have been attempting
to purchase their house back, but have not succeeded.

31.   Based on an interview of another victim ("Victim-
5"), I have learned, in part, the following:

a.   In late 2012, Victim-5 had fallen behind on
mortgage payments for her home in Brooklyn, New York, and was
approaching foreclosure.

b.   Around that time, a HASNY representative

---

[2] Based upon my knowledge of the responsibilities of CHRISTINE MAHARAJ, the
defendant, at the Hillside Address, and based upon Victim-3's physical
description of "Christine," I believe that "Christine" is CHRISTINE MAHARAJ.

contacted Victim-5 and arranged for Victim-5 to visit the Hillside Address.

c.   A car and driver picked up Victim-5 and transported her to the Hillside Address. At the Hillside Address, Victim-5 met with "Christine," [3] and another Hillside Business employee ("CC-5"). Victim-5 discussed a loan modification with CHRISTINE MAHARAJ, the defendant, and CC-5.

d.   On a later date, Victim-5 returned to the Hillside Address and met again with CHRISTINE MAHARAJ, the defendant, and CC-5. MAHARAJ and CC-5 informed Victim-5 that she could conduct a short sale of the home to her son and continue to live in the home. Victim-5 then signed numerous papers, though MAHARAJ and CC-5 did not tell her what she was signing.

e.   Victim-5 returned to the Hillside Address on a third date and confronted MAHARAJ and CC-5. Victim-5 told MAHARAJ and CC-5 that Victim-5 thought it was illegal for Victim-5 to short sell her house to her son. Victim-5 did not hear from HASNY again.

f.   In 2015, Victim-5 attempted to obtain a loan modification on her home. In seeking that modification, Victim-5 learned that Launch Development had placed a lien on her home and that she could not obtain a loan modification until the lien was removed.

## SAMANTHA BOUBERT

32.   Based on interviews with the Former Employees, I have learned, in part, the following:

a.   SAMANTHA BOUBERT, the defendant, has worked at the Hillside Address since approximately January 2013.

b.   One of BOUBERT's primary responsibilities was to file liens on the homes of potential and actual HASNY clients.

c.   BOUBERT was instructed by CC-1 to place liens on homes of potential and actual HASNY clients in order to force homeowners to deal with HASNY.

---

[3] Based upon my knowledge of the responsibilities of CHRISTINE MAHARAJ, the defendant, at the Hillside Address, I believe that "Christine" is CHRISTINE MAHARAJ.

    d. Employee-3 overhead BOUBERT discuss how she would forge homeowners' signatures on documents, and heard CHRISTINE MAHARAJ, the defendant, and others, warn BOUBERT that she would be caught.

    e. BOUBERT forged homeowners' signatures on legal documents, such as bank documents and mortgage documents, based on original client signatures obtained from documents clients brought or faxed to HASNY.

    33. Based on a review of records of bank accounts held by Launch Development and HASNY, I have learned in, part, that between in or about January 2013 and in or about February 2015, SAMANTHA BOUBERT, the defendant, received approximately thirty-four payments from Launch Account 1, for a cumulative total of approximately $149,182.00; and approximately five additional payments from Launch Account 2, for a cumulative total of approximately $11,514.00.

    34. On or about May 21, 2015, SAMANTHA BOUBERT, the defendant, consented to a voluntary interview with federal law enforcement. During the interview BOUBERT said, in sum and in part, the following:

    a. BOUBERT has been employed by Launch Development since approximately January 2013.

    b. BOUBERT understood HASNY's goal was to purchase properties cheaply and sell them for a profit. In her time with the company, BOUBERT knew of only ten or so clients that received loan modifications. BOUBERT once heard CC-2 tell CC-3, in sum and in part, "You know we don't do loan mods."

    c. BOUBERT filed liens on homeowners' properties so that those homeowners would have to go through a Hillside Business in order to conduct any further financial business associated with the property. BOUBERT understood the filing of liens to be a method for the Hillside Fraud Team to exert control over the homeowners' properties.

## The Hillside Fraud has Claimed Numerous Victims

    35. Based upon my own interviews of other victims, my conversations with other law enforcement agents, my review of reports of interviews of other victims, and my review of publicly available real estate documents, I know that other victims, located in the Bronx, Brooklyn, and Queens, had similar experiences to those described by Victim-1, Victim-3, and

Victim-4. Specifically, other victims were told that HASNY would assist them in obtaining a loan modification or other mortgage relief to avoid foreclosure, and then later learned that they had in fact sold their homes to Launch Development, or another Hillside Business, and would be forced to move out.

36.   Based upon my review of transaction documents and public real estate records, I know that Hillside Businesses have purchased dozens of properties in the Bronx, Brooklyn, and Queens since in or about January 2013.

37.   Based upon my review of transaction documents, including documents provided by the victims, I know that the Hillside Fraud Team submitted, or caused others to submit, short sale affidavits describing the sale as one made at arms' length.

38.   Based upon my review of transaction documents, and based on my experience in investigating financial crimes, I know that many of the victims who executed short sale documents had mortgages with banks that had received TARP monies or are insured by the FDIC, or both.

39.   Based upon my interviews with victims, my review of bank records, and my review of publicly available real estate documents, I know that CC-1, CC-2, and CC-3, have generated millions of dollars as a result of their fraudulent scheme.

40.   Based upon my review of the Automated City Register Information System ("ACRIS") database, I know that Launch Development filed approximately 218 UCC liens on properties in the Bronx, Brooklyn, and Queens since approximately in or about December 2012.

41.   From my training and experience, I know that when a UCC lien is filed on a property, it indicates that the property owner owes a debt to the lien holder and that the property cannot be sold to anyone other than the lien holder without discharging that debt.

WHEREFORE, I respectfully request that arrest warrants be issued for SAMANTHA BOUBERT, CHRISTINE MAHARAJ, and OWEN REID, the defendants, and that they be arrested and imprisoned or bailed, as the case may be.


ROBERT GOLDBACH
Special Agent
Federal Bureau of Investigation


Sworn to before me this
18th day of December, 2015

HONORABLE FRANK MAAS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK


16